UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 3:20-cr-00059-LRH-WGC |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| JOSE GUERRERO-LOPEZ, | |
| Defendant. | |

Before the Court is Defendant Jose Guerrero-Lopez' ("Guerrero-Lopez") motion to suppress evidence obtained from an alleged unconstitutional inventory search (ECF No. 21). The government filed an opposition (ECF No. 25), to which Guerrero-Lopez replied (ECF No. 26). On March 28, 2022, the Court held an evidentiary hearing on the matter (ECF No. 43). For the reasons articulated in this Order, the Court denies the motion.

**I.   BACKGROUND**

On November 22, 2020, Officer Brock with the Reno Police Department's ("RPD") Regional Gang Unit ("RGU") observed on SnapChat that Guerrero-Lopez had posted two videos to his account "Big P Guerrero". ECF No. 21-1 at 7. Specifically, Guerrero-Lopez' SnapChat account had a video of Guerrero-Lopez handling two black handguns, as well as a video of him cleaning a gun with live ammunition nearby. *Id.* RGU Officers were already aware that Guerrero-Lopez is a Sunset Trece gang member who has been previously convicted of a felony. *Id.* at 4.

Later that week, on November 27th, 2020, around 7:15 pm, RGU Officers observed a white 2007 Chevrolet Tahoe ("the vehicle") bearing Nevada Plate "UNR26178" travelling southbound

on Lymbery St. towards Moana Ln. in Reno, NV. ECF No. 21-1 at 5. RGU Officers knew from prior experience that Guerrero-Lopez frequently operates this vehicle. *Id.* RGU Officers were also aware that Guerrero-Lopez did not currently possess a valid driver's license. *Id.* Deputy Cossio advised the other officers that the vehicle's rear license plate was not illuminated. ECF No. 21-2 at 2.

Officers Zolkos and Staples, in an unmarked police unit, followed the vehicle southbound on Lymbery St. as it approached Moana Ln. *Id.* Officer Zolkos and Staples observed the vehicle stop in the middle of the crosswalk at the intersection of Lymbery St. and Moana Ln., and then proceeded to make an eastbound turn onto Moana Ln. headed towards S. Virginia St. *Id.* The Officers also observed that the vehicle had a non-functioning driver's side brake light. *Id.* At this moment, Officer Zolkos indicated in his report that he turned on his emergency red and blue lights to conduct a traffic stop. ECF No. 21-2 at 2. Officer Zolkos described that the vehicle slowed down but continued to travel for several hundred yards along Moana Ln. *Id.* After Officer Zolkos activated his siren several times to advise the driver of the vehicle to pull over, the vehicle eventually stopped in the right hand turn lane to go south onto S. Virginia St. *Id.*

Officer Zolkos contacted the driver, identified as Guerrero-Lopez, and advised him of the reason for the stop, and then asked for his driver's license, registration, and insurance. ECF No. 21-2 at 2. Guerrero-Lopez provided Officer Zolkos a state issued ID card and proceeded to tell Officer Zolkos that his driver's license was suspended but that he had an appointment with the DMV to get one. *Id.* Guerrero-Lopez then searched through the glove box for the rest of the documentation and provided Officer Zolkos with the vehicle registration but not the insurance. *Id.* Officer Zolkos suggested to Guerrero-Lopez that if he could access the insurance on his phone that would be acceptable. *Id.* Guerrero-Lopez called his girlfriend to try to find his proof of insurance as well as the proof that he had an appointment with the DMV for a driver's license. *Id.* After some time on the phone without any progress, Officer Zolkos instructed Guerrero-Lopez to hang up. *See* Exhibit E at 10:05 (Officer Cossio's Body Camera Footage).

1   At this moment, Officer Zolkos ordered Guerrero-Lopez to step out of the vehicle. Exhibit E at 10:35. Guerrero-Lopez asked Officer Zolkos why he needed to step out of the vehicle, and Officer Zolkos responded:

> Because we're the police. We stopped you for a traffic stop. We want to talk to outside the vehicle…Because you're inside a car. We haven't searched the car. We don't know what's inside the car. There could be weapons in the car. We're trying to do other things right now to make sure you can get on your way. Until we can do that safely, we need to get you out of the vehicle. So please step out of the vehicle.
>
> Exhibit E at 10:45–11:05.

In his report, Officer Zolkos explained that he asked Guerrero-Lopez to step out of the vehicle because he was "…known to RGU as a documented gang member, an ex-felon and recently in possession of a firearm…" ECF No. 21-2 at 2. Once Guerrero-Lopez stepped out of the vehicle, RGU Officers placed him in handcuffs and checked him for weapons. *Id.* In making the arrest, Officer Brock explained in his report that because Guerrero-Lopez had previously been issued a traffic citation for operating a motor vehicle without a driver's license on August 13, 2020, and RGU Officers arrested Guerrero-Lopez for the exact violation a year prior, it was determined that he did not qualify for a citation and would be arrested for the traffic violation. ECF No. 21-1 at 4.

Once handcuffed, Guerrero-Lopez asked to speak to Officer Zolkos in private away from the other officers. ECF No. 21-2 at 3. After moving to an area when it was just the two of them, Officer Zolkos stated that Guerrero-Lopez told him, without asking any questions, that "there's a gun in the back" of the vehicle. ECF No. 21-2. Guerrero-Lopez explained that the gun was his friend's, but he needed protection because of a past gunshot wound. *Id.* Officer Zolkos advised the other officers on scene that Guerrero-Lopez had disclosed there was a gun in the vehicle. *Id.*

Because RGU Officers were going to arrest Guerrero-Lopez for his traffic violations, and the vehicle was blocking the turn lane onto S. Virginia St., a tow was requested for the vehicle. ECF No. 21-2 at 3. While Officer Zolkos spoke with Guerrero-Lopez separately, a K-9 officer arrived and asked the other officers if they wanted a dog sniff on the car. Exhibit E at 16:50–17:00. After some back and forth, it was determined that a sniff was not necessary at that moment as the

Officers were going to conduct an inventory search incidental to the tow. *Id.* at 17:20–30. RGU Officers conducted an inventory search of the vehicle because of the tow request. *Id.* During the inventory search, Officer Rose found a handgun, magazine, and ammunition in the rear area of the vehicle. ECF No. 21-3. The gun, a black Springfield Armory, model XD, .45 caliber pistol bearing serial number US689533 looked very similar to the firearm depicted in Guerrero-Lopez' SnapChat videos. ECF No. 21-1 at 7. In his inventory search vehicle report, Officer Rose listed the handgun, a set of tires, a brown purse, as well as other "miscellaneous" items scattered throughout the car. ECF No 21-5 at 2. Guerrero-Lopez agreed to return to the RPD station to speak with officers where he was read his *Miranda* rights. ECF No. 21-2 at 3.

Because of Guerrero-Lopez' prior criminal history, Guerrero-Lopez was indicted on one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Guerrero-Lopez now moves to suppress the discovered handgun and his statement regarding the handgun because of alleged violations of his Fourth Amendment rights.

## II.  DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons…against unreasonable searches and seizures." U.S. CONST. amend. IV. While a warrant is generally required, "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness,' [meaning] the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11 (1999)). In this case, the government argues two exceptions exist to the warrant requirement: the general automobile exception and the inventory search exception.

Guerrero-Lopez presents two arguments in support of his motion to suppress that neither of these exceptions is present: (1) that his admission to the presence of a gun was the product of a custodial interrogation without the benefit of *Miranda* warnings and it should be suppressed; and (2) that the inventory search of the vehicle was merely pretext to search for evidence of criminal activity and therefore the handgun should be suppressed. ECF No. 21. Each argument is addressed in turn.

///

4

### A. Guerrero-Lopez' Admission and *Miranda*

The primary question in this case, inventory search notwithstanding, is whether or not Guerrero-Lopez' statement to Officer Zolkos that "there's a gun in the back" of the vehicle provided the Officers sufficient probable cause to search the vehicle. The Court answers the question in the affirmative and finds that the statement did provide the Officers with the requisite probable cause to search the vehicle. *See United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) ("Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime."). Still, Guerrero-Lopez argues that the statement should be suppressed as it was the product of a custodial interrogation without the benefit of *Miranda* warnings.

In *Miranda v. Arizona*, the Supreme Court ruled that a criminal suspect in custody, prior to any questioning, must be informed of their constitutional rights to an attorney and against self-crimination. 384 U.S. 436 (1966). A criminal suspect is in custody if "[they] are under arrest, or if [their] freedom of movement is restrained to a degree associated with formal arrest." *United States v. Brady*, 819 F.2d 884, 887 (9th Cir. 1987). In addition, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible evidence." *Miranda*, 384 U.S. at 478.

Here, Guerrero-Lopez argues that the RGU Officers were required to give him *Miranda* warnings prior to his admission that there was a gun in the vehicle because they subjected him to the functional equivalent to express questioning. ECF No. 21 at 22–25. More specifically, Guerrero-Lopez maintains that by confronting him with the prospect of an inventory search, the RGU Officers should have known there was a reasonable likelihood that he would make an incriminating statement, and therefore should have warned him of his constitutional rights. *Id.* In response, the government asserts that Guerrero-Lopez' statement was entirely voluntary as Officer Zolkos had no indication what Guerrero-Lopez wanted to speak to him about when asked if he

could speak privately, and the Officers did not in any way engage in coercive actions. ECF No. 25 at 10.

The Court finds that Guerrero-Lopez was not subject to the functional equivalent of express questioning when he admitted to the existence of a firearm in the vehicle. While Officers did place Guerrero-Lopez in custody when they handcuffed him, that "attendant" circumstance alone does not affect the interrogation analysis. *See Innis* 446 U.S. at 300 ("'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). Rather, upon a review of the body cam footage, there is no indication that Guerrero-Lopez was aware that an inventory search would occur subsequent to him stepping out of the vehicle.[1] Guerrero-Lopez was some distance away from the other officers when he spoke to Officer Zolkos privately, and it was Guerrero-Lopez who told Officer Zolkos about the firearm without any specific questioning or confrontation on behalf of Officer Zolkos about potential criminal activity.[2] Taken together, these facts indicate that Guerrero-Lopez' admission was given "freely and voluntarily and voluntarily without any compelling influences…" *Miranda*, 384 U.S. at 478. Therefore, because Officers were not required to provide Guerrero-Lopez *Miranda* warnings prior to his voluntary admission, the motion to suppress will be denied as to the statement. The Court further finds that the Officers had probable cause to search the vehicle because of the statement. Nevertheless, the Court will also address the issues raised by Guerrero-Lopez as to the inventory search.

**B. Constitutionality of the Inventory Search**

Exceptions to warrant requirements includes inventory searches conducted by law enforcement. *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) ("…police may, without

---

[1] Guerrero-Lopez also notes that while he was still in the vehicle, Officer Zolkos told him to step out of the vehicle because "…[w]e haven't searched the car" yet. Exhibit E at 10:05-11:05. However, when viewed in context, Officer Zolkos' statement was intended to explain to Guerrero-Lopez why they wanted him to step out of the vehicle for officer safety reasons as opposed to the prospect of an immediate search. *Id.* at 10:45–11:05 ("We want to talk to you outside the vehicle…Because you're inside a car. We haven't searched the car. We don't know what's inside the car. There could be weapons in the car. We're trying to do other things right now to make sure you can get on your way. Until we can do that safely, we need to get you out of the vehicle.").

[2] At the evidentiary hearing, Guerrero-Lopez' counsel disputed the fact Guerrero-Lopez was the one to initiate the conversation with Officer Zolkos. Specifically, counsel pointed to the fact that before exiting his vehicle, Guerrero-Lopez was told by Officer Zolkos that "we want to talk to you outside the vehicle…" Exhibit E at 10:05-11:05. However, that general statement does not indicate that Officer Zolkos had subjected Guerrero-Lopez to express questioning regarding criminal activity.

6

a warrant, impound and search a vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic."). The purpose of an inventory search is to "…'produce an inventory' of the items in the car, in order 'to protect an owner's property while it is in custody of the police….'" *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)).

Inventory searches cannot be solely conducted in order to discover incriminating evidence. *See Johnson*, 889 F.3d at 1125 ("the purpose of the search must be non-investigative; it must be the basis of something other than suspicion of evidence of criminal activity."). Rather, the search must be a suspicionless administrative search in order to compile a list of the vehicle's inventory before a tow. *Id.* Still, "the mere 'presence of a criminal investigatory motive' or a 'dual motive— one valid, and one impermissible—' does not render an administrative stop or search invalid; instead, [the Court] ask[s] whether the challenged search or seizure 'would…have occurred in the absence of an impermissible reason.'" *Id.* (quoting *United States v. Orozco*, 858 F.3d 1204, 1210–13 (9th Cir. 2017).

Here, Guerrero-Lopez contends that the inventory search was merely pretext to search the vehicle for evidence of criminal activity. Specifically, Guerrero-Lopez argues that: (1) RGU Officers purposefully stopped the vehicle in a turn lane as an excuse to tow the car; (2) Officer Frank disregarded RPD traffic citation policy; (3) RGU Officers ignored RPD vehicle disposition policy by not giving Guerrero-Lopez an opportunity to have someone retrieve his car; and (4) RPD's impound policy is unconstitutional. Each of these arguments, and the government's responses, are addressed in order.

1. Turn Lane

A central element of Guerrero-Lopez' argument is that where the traffic stop took place, in the turn lane onto S. Virginia St., was a ploy to tow and inventory the vehicle. ECF No. 25 at 12. However, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United Sates*, 517 U.S. 806, 810 (1996). Guerrero-Lopez does not contest that he committed three traffic violations:

(1) driving without an illuminated license plate; (2) driving without a functioning brake light; and (3) not coming to a full stop at a stop sign. Therefore, the RGU Officers had probable cause to stop the vehicle as they had observed all three traffic violations before activating their emergency lights and sirens.

Moreover, Guerrero-Lopez was the one who did not immediately pull over when the RGU Officers attempted to conduct the traffic stop. And while Moana Ln. is a busy thoroughfare, there is no evidence that the RGU Officers forced Guerrero-Lopez to pull over in the turn lane onto S. Virginia St., one of the most heavily traveled streets through Reno. As Guerrero-Lopez points out in his motion, directly south of Moana Ln., and not far from the Lymbery/Moana intersection, is a parking lot for a public park. Instead of choosing to pull over there, or on the side street just past the parking lot for the park, Officer Zolkos noted in his report that, after he activated his emergency lights and siren several times, Guerrero-Lopez continued to travel for a few hundred yards before he came to a complete stop in the turn lane. For these reasons, there is no indication that the RGU Officers purposefully stopped the vehicle in the turn lane as pretext to conduct an inventory search.[3]

### 2. RPD Traffic Citation Policy

Guerrero-Lopez maintains that the RGU Officers failed to adhere to RPD policy by choosing to arrest him in lieu of a citation for driving without a valid license. Still, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). In addition, as stated in the RPD citation policy general order, certain criteria must be met before arresting an individual because of a traffic violation. ECF No. 21-6. One of the criteria is whether "[t]here is a reasonable likelihood that the offense will continue or resume…" *Id.* at 3. And once an officer arrests someone instead of citing

---

[3] Guerrero-Lopez also argues that a conversation the K-9 officer had on scene with Officer Frank demonstrates the pretextual nature of the traffic stop in the turn lane. ECF No. 21 at 13. Specifically, Guerrero-Lopez contends that the fact that Officer Frank told the K-9 officer that a dog sniff was unnecessary because they would be towing the car and conducting an inventory search demonstrates pretext on part of the officers. *Id.* at 14. However, this offhand conversation does not contain any indication of purposeful malfeasance on part of the RGU officers.

8

them, "officers will include in their report narratives reasons the suspect was booked rather than cited for the offense." *Id.*

Here, RGU Officers had probable cause to arrest Guerrero-Lopez for driving without a valid license. After Officer Zolkos asked him for his driver's license, Guerrero-Lopez could not provide a valid driver's license and admitted that his was suspended. And while he did claim that he had a DMV appointment to obtain his license, that still means at the time of the traffic stop, Guerrero-Lopez was driving without a valid license. Officer Frank provided in his report narrative reasons why Guerrero-Lopez was arrested rather than cited for this offense. Specifically:

> [i]t was learned on scene that [Guerrero-Lopez] had been issued a traffic citation for operating a motor vehicle without a driver's license in the city of Reno on August 13th, 2020. Due to this as well as the [RGU] arresting [Guerrero-Lopez] for the exact violation a year prior, it was determined that [he] did not qualify for a citation and would be arrested for the traffic violations.

ECF No. 21-1 at 6–7. Therefore, based on Guerrero-Lopez's past record, that is, two prior incidents of driving without valid driver's license, it was determined that there was a "reasonable likelihood" that he would continue to drive without a valid driver's license. RGU Officers adhered to RPD citation policy when they arrested him for the traffic violation.

### 3. RPD Vehicle Disposition Policy

Guerrero-Lopez also argues that the RGU Officers jettisoned RPD vehicle disposition policy when they failed to give him an opportunity to have someone retrieve the vehicle. ECF No. 21 at 14. According to the RGU Officers on scene, a tow of the vehicle was necessary because "[Guerrero-Lopez was arrested], as well as the vehicle being parked in the middle of W. Moana Ln., southbound turn lane, it was determined that the vehicle would be towed per procedure." ECF No. 21-1. RPD's vehicle disposition policy states, in relevant part, that "[w]hen practicable, the officer may abide by the wishes of the arrestee regarding disposition of his/her vehicle, and the vehicle may be released to a responsible party designated by the arrestee." ECF No. 21-7.

Guerrero-Lopez frames RPD's vehicle disposition policy regarding responsible party vehicle retrieval as a requirement as opposed to a discretionary decision. However, it is clear from the language of the policy that officers are not required in every instance to find a responsible party

to release the vehicle to—especially when, as here, the arrestee is not the owner of the vehicle and has not requested that officers contact the owner. *See* ECF No. 21-7 at 4 ("If the arrestee is not the registered owner of the vehicle, the officer will notify Communications that the arrestee requested that the vehicle be left on scene."). Therefore, because the policy provides RGU Officers with latitude regarding vehicle retrieval, the decision not to seek out a party to retrieve the vehicle does not indicate pretextual motivations on part of the officers—especially when the Officers had probable cause based off Guerrero-Lopez' admission to believe that a firearm was inside the vehicle. *See United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) ("[t]here must be something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence.") (cleaned up).

### 4. RPD Impound Policy

In addition to the quoted vehicle disposition policy above, Guerrero-Lopez further contends that RPD's entire impound policy is unconstitutional as it is not designed to produce a proper inventory and it affords the searching officer(s) too much discretion. Inventory searches must be conducted pursuant to a standard department policy that does not allow an individual officer "so much latitude that inventory searches are turned into a 'purposeful and general means of discovering evidence of a crime'" *Florida v. Wells*, 495 U.S. 1 (1990) (cleaned up). In relevant part, RPD's impound policy states:

> All impounded vehicles will be inventoried for liability purposes, unless the vehicle is being sealed for evidentiary purposes. If the keys are available, the inventory search of a lawfully-impounded vehicle will extend to the glove box, trunk, and/or any locked or closed container (briefcase, suitcase, toolbox, etc.) in the vehicle. This will be a reasonable inventory, using the same language as the Tiburon system, e.g., if there are three bags of items, on the inventory simply write "three bags."

ECF No. 21-7. Guerrero-Lopez argues this policy falls short of the constitutional standard set forth in *Wells* because the policy leaves far too much discretion to the searching officer. Specifically, Guerrero-Lopez states that the policy is silent about what an officer should do if keys are unavailable to open a locked item, is unclear about whether officers are permitted to forcefully open a locked item and fails to set forth an outer perimeter for the scope of the inventory search.

ECF No. 21 at 19–20.[4] Moreover, Guerrero-Lopez further asserts that the RPD policy's use of the Tiburon system violates the constitution because it allows officers to camouflage their search for incriminating evidence.[5]

In *Wells*, the police department at issue had no policy regarding the opening of closed containers. 495 U.S. at 4–5. As such, the Court in *Wells* held that while officers cannot have "uncanalized discretion" during an inventory search, that does not mean the search must "be conducted in a totally mechanical 'all or nothing' fashion." *Id.* at 4. Rather, policies can provide officers "sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.* The ability for officers to exercise judgement does not inherently violate the Fourth Amendment. *Id.*

Here, RPD policy only allows for officers to inventory locked containers, including the glove box and trunk, if the keys are available. If keys are not available, it logically follows that RPD policy prohibits officers from opening locked containers. This policy does not violate the standards set forth in *Wells* as it provides parameters for the officers to follow if they encounter locked containers. In addition, the RPD policy's use of the Tiburon system for describing what property is found during an inventory search does not violate any constitutional standard set forth in *Wells* as it limits officers discretion by standardizing how officers describe seized property. Therefore, for these reasons, the RPD impound policy does not violate any constitutional standards for inventory searches.

Accordingly, because there is no indication that the RGU Officers inventory search served as pretext to find incriminating evidence, the Court will deny the motion to suppress as to the firearm.

///

///

///

---

[4] Notably, Guerrero-Lopez' issues with these aspects of the impound policy are largely moot as a 2007 Chevrolet Tahoe is an SUV and has no trunk and the officers did not attempt to unlock a locked item. This is further bolstered by the fact that the gun was openly behind the rear seat.
[5] Tiburon refers to RPD's report writing system via a computer software.

11

### III. CONCLUSION

IT IS THEREFORE ORDERED that Guerrero-Lopez' motion to suppress (ECF No. 21) is **DENIED**.

IT IS SO ORDERED.

DATED this 11th of April, 2022.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE